UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION


ANITA FUGATE,

      Plaintiffs,

v.                                               Case No. 5:04-cv-245-Oc-10GRJ

RELIASTAR LIFE INSURANCE COMPANY,
an out-of-state corporation,

      Defendant.
_____/

## **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, ANITA FUGATE, pursuant to *Fed.R.Civ.P.* 56(a), moves for final summary judgment in connection with Count II of her Amended Complaint for Money Damages against Defendant, RELIASTAR LIFE INSURANCE COMPANY, and states:

1.      Plaintiff, Anita Fugate ("Ms. Fugate") is the beneficiary under a group life insurance policy issued by Reliastar Life Insurance Company. The life insurance policy in question insured the life of Keith Fugate and provided for the payment of accidental death benefits in the event the insured died as the result of an accident.

2.      Keith Fugate, while insured under Reliastar's policy, died on May 19, 2001 as the result of an unintended, accidental death. Since his death was

accidental, Reliastar is required to pay accidental death benefits under the group life insurance policy in question.

3. Most of the material facts for the Court's consideration have been admitted by the parties. These facts, which are set forth in more detail below, include the following:

    a. The group life insurance policy in question provides accidental death benefits in the amount of $206,000, which is the principal amount due if this is a compensable claim;

    b. Keith Fugate died while engaging in the practice of auto-erotic asphyxiation, which is a sexual activity in which the participant seeks increased sexual gratification through the restriction of oxygen flow to the brain;

    c. Keith Fugate was not attempting to commit suicide at the time of his death;

    d. The group life insurance policy in question was issued by Reliastar in connection with an employee benefit plan maintained by Keith Fugate's employer, ADC Telecommunications, Inc.; and

    e. This claim for recovery of benefits is governed by 29 U.S.C. §1132(g), ERISA's civil enforcement provision.

4. Ms. Fugate has properly submitted a claim for the accidental death benefits and has satisfied all conditions precedent to recovery of such benefits,

including exhausting her administrative remedies, but Defendant Reliastar has improperly denied payment the benefits due. A more detailed description of the undisputed material facts, with supporting citations to the record, is set forth below.

5. In addition to the principal amount due, Ms. Fugate is also entitled to recover accrued interest on the amount due.

6. This Court also has discretion, pursuant to 29 U.S.C. §1132(g), to allow a reasonable attorney's fee to Ms. Fugate as the prevailing party.

7. As demonstrated by Ms. Fugate in the detailed Statement of Facts set forth below, and in her separately filed Memorandum of Law in support of this Motion for Summary Judgment, she is entitled to judgment in her favor as a matter of law.

WHEREFORE, Plaintiff Anita Fugate requests the Court enter judgment in her favor for money damages in the principal amount of $206,000, plus accrued interest, plus attorney's fees and costs incurred in pursuing this action

### STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This is a claim to force payment of accidental death benefits which are due from Reliastar Life Insurance Company as the result of the accidental death of one of Defendant's insureds, Keith Fugate. Plaintiff Anita Fugate is a beneficiary under the group life insurance policy issued by Reliastar which insured the life of Keith Fugate. *See* Plaintiff's and Defendant's joint Stipulation of Facts, which was filed

with the Court on December 3, 2004, at ¶¶ 4-7.[1] The group life insurance policy in question, a copy of which is attached as Exhibit A, provides for the payment of accidental death benefits in the event an insured dies as a result of an accident. *See* Exhibit A at p. 10.

Keith Fugate died on May 19, 2001 at the age of 45. *See* Stipulation at ¶1. At the time of his death, he was an employee of ADC Telecommunications, Inc. ("ADC"), and was a participant in an employee benefit plan which provided life insurance benefits and other benefits to employees. Stipulation at ¶4. The employee benefit plan purchased a group life insurance policy from Reliastar for the purpose of securing payment of the life insurance benefits afforded by the plan. In his enrollment form, Keith Fugate named Anita Fugate as his beneficiary. *See* Stipulation at ¶7. Pursuant to the policy, a total of $206,000 in accidental death benefits must be paid by Reliastar to due to Anita Fugate in the event Keith Fugate died of an accidental death, unless an exclusion to coverage is applicable. Stipulation at ¶6.

The relevant portions of the group life insurance policy provide as follows concerning the payment of accidental death benefits:

> **Accidental Death & Dismemberment (AD&D Insurance)**
>
> Reliastar pays this benefit if you lose your life… …due to an accident. All of the following conditions must be met:
> - You are covered for AD&D insurance on the date of the accident.

---

[1] For purposes of brevity, the parties' joint Stipulation of Facts is hereinafter referred to as the "Stipulation."

4

- Loss occurs within 180 days of the date of the accident.
- The cause of the loss is not excluded.

-----

Reliastar pays the benefit shown below if you suffer any of the losses listed. The Full Amount is shown on the Schedule of Benefits. Reliastar pays only one Full Amount while the Group Policy is in effect. If you have a loss for which Reliastar paid ½ of the Full Amount, Reliastar Life pays no more than ½ of the Full Amount for the next loss.

**For Loss of:**                                       **The benefit is:**

Life…………………………………………………Full Amount
----

Death benefits are paid to your beneficiary.

**Accidental Death and Dismemberment Exclusions**

Reliastar Life does not pay for loss directly or indirectly caused by any of the following:

- Suicide or intentionally self-inflicted injury, while sane or insane.

*See* Exhibit A at p. 10.

On or about June 11, 2001, after Keith Fugate's death, Anita Fugate presented a claim to Reliastar for the accidental death benefits due. Stipulation at ¶8. Ms. Fugate was not assisted by counsel at the time the application for benefits was submitted. *See* Affidavit of Anita Fugate, a copy of which is attached as Exhibit B. A copy of the claim form submitted by Ms. Fugate to Reliastar is attached as Exhibit C.

On August 1, 2001, Reliastar denied Ms. Fugate's claim for the accidental death benefits by letter correspondence. In its 8/1/01 denial letter, a copy of which

is attached as Exhibit D, Reliastar denied the claim for accidental death benefits by relying upon an exclusion to coverage contained within the policy. The exclusion which it relied upon indicated accidental death benefits are not payable "for a loss which is directly or indirectly caused by an intentionally self-inflicted injury." Reliastar did not suggest in its denial letter that the information it had received and reviewed had led it conclude that Mr. Fugate's death was not an accident, implicitly suggesting it conceded Mr. Fugate's death was the result of an "accident" and would be a compensable claim if not for the intentional, self-inflicted injury exclusion it relied upon in support of the denial.

Ms. Fugate was not represented by legal counsel when she first submitted the claim for benefits. *See* Affidavit of Anita Fugate at ¶5, a copy of which is attached as Exhibit B. Following the initial denial, Ms. Fugate hired legal counsel to evaluate whether Reliastar's denial of benefits was appropriate. *Id.* On September 17, 2001, her counsel wrote Reliastar to communicate Ms. Fugate's desire to exercise a right of review which had been described in Reliastar's 8/1/01 denial letter. The denial letter in no way suggested this claim, which was presented to and then denied by an insurance company in connection with a group life insurance policy, was an ERISA claim. In addition, when notifying Reliastar of Ms. Fugate's desire to exercise the right of review which had been described in the 8/1/01 denial letter, Ms. Fugate's counsel requested in the 9/17/01 letter to Reliastar that it answer the following specific questions concerning the claim:

> 1. What information Reliastar had received and considered in making its decision; and
>
> 2. What guidelines, written or otherwise, Reliastar could provide for [counsel's] assistance in making the proper submission of material.

In addition to these specific questions, Ms. Fugate's counsel also requested a copy of the portion of the actual policy that described accidental death benefits, the exclusions thereto, and any provisions relating to disputes thereunder, inviting Reliastar to simply provide a complete copy of the policy if that was the easiest way to provide the relevant policy language. Ms. Fugate's counsel also requested confirmation that receipt of the letter would satisfy the 60-day request for review deadline set forth in the denial letter. A copy of this initial letter from Ms. Fugate's counsel to Reliastar is attached as <u>Exhibit E</u>.

On September 25, 2001, Reliastar responded to counsel for Ms. Fugate with a one-page letter enclosing a copy of the group life insurance policy and copies of the claim information it had received. There was no reference in the letter to an ERISA plan, and no plan booklets, plan descriptions, or summary plan descriptions were provided. The 9/25/01 letter from Reliastar confirmed that a total of $206,000 in accidental death benefits was provided under the policy in the event of accidental death and described the information Reliastar had received to date in connection with the claim: (a) the claim form, (b) a certified death certificate, (c) enrollment forms, (d) a copy of the accident report, and (e) a copy of the investigative report. No further information concerning claims procedures was

provided, as had been specifically requested by counsel for Ms. Fugate. A copy of Reliastar's 9/25/01 letter is attached as <u>Exhibit F</u>.

On November 28, 2001, counsel for Ms. Fugate submitted an initial appeal in response to the August 1, 2001 denial letter. In the 11/28/01 appeal letter, counsel for Ms. Fugate pointed out Reliastar had failed to provide specific information which had been requested concerning the review process, including guidelines for the review, what was meant by Reliastar's previous reference to "additional documentation" that may be submitted on Ms. Fugate's behalf (including the form in which it needed to be submitted), and a confirmation that the request for review was timely. In the 11/28/01 letter, Ms. Fugate's counsel then discussed the policy exclusion relied upon in the insurer's denial letter (the intentional, self-inflicted injury exclusion) and explained why the exclusion was not applicable. Since the exclusionary clause referenced in Reliastar's 8/1/01 denial letter was the <u>only</u> reason raised by Reliastar in denying the claim, counsel for Ms. Fugate addressed that issue only in the initial 11/28/01 appeal letter. A copy of the 11/28/01 appeal letter is attached as <u>Exhibit G</u>.

On January 29, 2002, Reliastar responded to the appeal by again denying the claim. This time, however, after an appeal had already been presented based upon an assumption by Ms. Fugate's counsel that the claim had been denied based only upon the intentional, self-inflicted injury exclusion, and without cooperation from Reliastar's representatives in communicating the applicable claims procedures, Reliastar denied the claim for a second time--but now for two

separate reasons.  In the 1/29/02 denial letter, Reliastar again invoked the intentional, self-inflicted injury exclusion.  However, in this second denial letter Reliastar for the first time raised another reason for denial, arguing that Keith Fugate's death was not an "accident" under the terms of the policy.  Reliastar's representative did admit that the company's review had led it to conclude that Mr. Fugate did <u>not</u> intend the final result which occurred, which was his unexpected death.  Reliastar suggested, however, that since Mr. Fugate "had tied a complex knot around his neck, rigged the rope to a door handle and metal hinge, and constricted his oxygen supply, the death was not accidental and therefore not compensable under the accidental death benefit provision of the policy."  Reliastar's position was that it "believe[d] the death was not unexpected because the insured intentionally placed the noose over his neck and hung himself from the bathroom door."  Despite Reliastar's admissions that Mr. Fugate did not intend to commit suicide or cause his death, and was instead was engaging in auto-erotic asphyxiation, Reliastar contradicts itself by arguing Mr. Fugate's death was "not unexpected."  A copy of the 1/29/02 denial letter is attached as <u>Exhibit H</u>.

On December 30, 2002, Ms. Fugate's counsel submitted additional information in support of the claim.  On that date, counsel forwarded a letter to Reliastar enclosing a copy of *Padfield v. AIG Insurance Co.*, 290 Fed. 3d 1121 (9th CIR 2002), a nearly identical ERISA case concerning a claim for accidental death benefits and death as a result of autoerotic asphyxiation gone awry.  In the *Padfield* decision, discussed in more detail in Ms. Fugate's separately filed Memorandum of

Law, the Ninth Circuit Court of Appeals determined in an ERISA case that, as a matter of law, death which occurs as a result of an insured engaging in the practice of autoerotic asphyxiation (1) is a compensable "accident," and (2) does not fall with the purview of an "intentionally, self-inflicted injury" exclusion, for purposes a claim for accidental death benefits. In addition to providing a copy of the *Padfield* decision, Ms. Fugate's counsel requested in the 12/30/02 letter that Reliastar answer two specific questions: (1) whether Reliastar contended the insurance policy in question was governed by ERISA and, if so, why; and (2) if Reliastar contended the policy was governed by ERISA, then to advise whether it is Reliastar's position that the benefit plan gives the administrator discretionary authority to construe the terms of the plan. A copy of the 12/30/02 letter is attached as Exhibit I.

Following receipt of counsel's letter and the *Padfield* decision, Reliastar's representative responded on January 29, 2003. Reliastar advised that a copy of the *Padfield* decision had been forwarded to its legal department for review and that, following completion of their review, counsel for Ms. Fugate would be further advised concerning Reliastar's decision concerning the claim. Reliastar again failed, however, to answer the specific questions posed by counsel for Plaintiff concerning whether it contended ERISA governed this claim for accidental death benefit. A copy of the 1/29/03 letter from Reliastar to Ms. Fugate's counsel is attached as Exhibit J.

Due to Reliastar's failure to answer the specific questions posed concerning its contentions regarding the applicability of ERISA, and whether discretionary review had been granted, Ms. Fugate's counsel again inquired by letter, on February 6, 2003, concerning whether Reliastar contended ERISA applied to this claim. A copy of counsel's 2/6/03 letter is enclosed as <u>Exhibit K</u>. Reliastar again failed to timely respond to the 2/6/03 follow-up letter. Ms. Fugate's counsel then sent yet another written request, on March 20, 2003, seeking a response from Reliastar concerning these important questions. A copy of the 3/20/03 follow-up letter from Ms. Fugate's counsel is attached as <u>Exhibit L</u>.

On April 2, 2003, Reliastar finally provided its response to the additional information submitted by Ms. Fugate's counsel on 12/30/02. In the 4/2/03 letter letter, signed by Theresa Morones as "Counsel" for Reliastar, Reliastar indicated that it was its position that this claim for benefits was subject to ERISA law. Ms. Morones expressly admitted, however, that the booklet that the employer had provided to the insured employee, Keith Fugate, did <u>not</u> contain language granting the claims administrator discretionary authority to interpret the provisions of the plan. In this same letter, which was the first time Reliastar ever notified Ms. Fugate or her counsel that it contended this claim was governed by ERISA law and claims procedures, Reliastar again denied the claim for benefits and advised counsel for

Ms. Fugate that she had exhausted her administrative remedies. A copy of the 4/2/03 letter from Reliastar to counsel for Plaintiff is attached as Exhibit M.[2]

Discovery conducted in this action has revealed a legal analysis was in fact performed by Reliastar's in-house counsel. A copy of the in-house legal opinion, to which Ms. Fugate was entitled to have as an ERISA beneficiary[3] (but which Reliastar did not share with Ms. Fugate when it was completed)[4], is attached as Exhibit N. The memorandum requesting the legal analysis is included as part of Exhibit N. It is noteworthy that in the memo requesting the in-house legal opinion, Reliastar's representatives did not ask for an analysis concerning whether it would be appropriate to honor or deny Ms. Fugate's claim. Instead, the representative requesting the review asked in-house counsel "whether you believe [Reliastar] could continue to deny the claim for Accidental Death Benefits?" This statement illustrates Reliastar's focus was clearly on finding reasons to support denial of this claim, not on evaluating the claim with due regard for Ms. Fugate's interests as a plan beneficiary.

---

[2] As addressed in Ms. Fugate's Memorandum of law, the above-described procedural deficiencies and fiduciary breaches in Reliastar's handling of Ms. Fugate's claim have been prejudicial to her.

[3] *See In Re: Long Island Lighting Co.*, 129 F.3d 268 (2nd Cir. 1997).

[4] The results of the legal review were not shared with Ms. Fugate even though her counsel, from the outset, had specifically requested Reliastar inform Ms. Fugate of the information it was relying upon in denying the claim. Considering the fiduciary duty owed by Reliastar to Ms. Fugate, it is reasonable to expect the results of this legal analysis relied upon by Reliastar would have been shared even without a specific request by Ms. Fugate to be informed of the reasons for Reliastar's decision.

In the legal opinion, in-house counsel for Reliastar cited to *Bennett v. American International Life Insurance Co. of New York* 956 F.Supp. 201 (N.D. New York 1997), which is another ERISA case addressing a claim for accidental death benefits when death resulted to an insured as a result of participation in auto-erotic asphyxiation. In the *Bennett* decision, the District Court for the Northern District of New York had also cited to, and discussed in detail, *Todd v. AIG Life Insurance Co.* 47 Fed.3d 1448 (5th Cir. 1995). *Todd* is yet another ERISA case addressing a claim for accidental death benefits when death resulted to an insured as a result of participation in auto-erotic asphyxiation.

Before Reliastar had finally denied this claim for accidental death benefits and advised Ms. Fugate that she had exhausted her administrative remedies, Reliastar was aware the *Padfield*, *Bennett*, and *Todd* decisions as well as all the scientific evidence discussed in those cases concerning auto-erotic asphyxiation. As addressed in Ms. Fugate's Memorandum of Law, each of these decisions, and all the scientific evidence described in them, therefore became a part of the administrative record. The scientific evidence discussed in those cases included the following:

- Autoerotic asphyxiation is "the practice of limiting the flow of oxygen to the brain during masturbation in an attempt to heighten sexual pleasure."

- Autoerotic asphyxiation "is a repetitive pattern of behavior that individuals engage in over a period of years, and generally the intent of the individuals performing this act is not death."

- The most common form of this behavior is where the reduction in oxygen is achieved with the application of pressure to the veins carrying blood out of the head, which requires minimal pressure on the neck and "essentially keeps blood from leaving the brain, which continues to use oxygen until the oxygen in the blood is depleted enough to give the desired euphoric effect."

- Because of equipment malfunctions, errors in the placement of the noose or ligature, or other mistakes, accidental deaths sometimes occur in connection with autoerotic asphyxiation. Data from the United States, England, Australia, and Canada indicate that one to two hypoxyphilia-caused deaths per million population are detected each year [quoting the Diagnostic and Statistical Manual of the American Psychiatric Association Fourth Edition (DSM-IV)].

- The use of asphyxia to heighten sexual arousal more often than not has a nonfatal outcome, as described by experts Hazelwood, Dietz & Burgess, *Autoerotic Fatalities* 49 (1983).

- Death following autoerotic asphyxiation is due to the failure of some mechanism or strategy that the practitioner thought was fail-safe. Sometimes the device [used in the practice of autoerotic asphyxiation] is quite complex but in others they have simply relied upon their subjective awareness of losing consciousness to reverse the process by, for example, grabbing onto nearby supports or extending their legs to reduce the pressure on their neck and thereby avoid a fatal mishap.

All this information concerning autoerotic asphyxiation is set forth in the Padfield, Bennett, and Todd cases and was known to Reliastar before it finally denied Ms. Fugate's claim.

One factual issue the Court may need to consider in this case is whether Reliastar's decision to deny this claim indeed benefits the participants and

beneficiaries of the employee benefit plan in question.[5] During discovery, counsel for Ms. Fugate sent an interrogatory to Reliastar requesting it explain how its decision benefits plan participants and beneficiaries. The reasons given by Reliastar in its interrogatory answer are the following:

> [It]has a duty to participants and beneficiaries of the Plan to maintain the integrity of it and to pay only those claims that meet the conditions of the Policy and are not excluded by it. Thus Reliastar has a routine practice by which it reviews claims, and it followed that procedure in this case. Wrongfully paying claims is contrary to Reliastar's duty to act prudently and in the best interests of all Plan participants… …By strictly adhering to the terms of the Policy, by following its routine of reviewing claims, and by making thoughtful decisions based upon the facts presented, Reliastar acts in the overall best interests of the Plan participants and beneficiaries.

*See* Reliastar's Answer to Interrogatory #12 from Ms. Fugate, a copy of which is attached as <u>Exhibit O</u>.

As argued in Ms. Fugate's separate Memorandum of Law, considering all the information available to Reliastar before its final denial of this claim, and its admissions that Mr. Fugate died while engaging in autoerotic asphyxiation and did not expect to die (i.e. was not intending to commit suicide), Ms. Fugate's is entitled to summary judgment in her favor as a matter of law.

---

[5] As set forth in Ms. Fugate's Memorandum of law, this factual issues is one of the steps the Court must consider if the heightened arbitrary and capricious standard of review is applicable, as urged by Reliastar.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 15, 2004, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic mailing to the following: Nancy J. Faggianelli, Esq. and Bradley J. Betlach, Esq.

                    THE BRIGGS LAW FIRM, P.A.

By:   __s/ Steven W. Wingo_____
Randy R. Briggs
Florida Bar No. 197882
Trial Counsel
Steven W. Wingo
Florida Bar No. 0008011
521 S.E. Fort King Street
Post Office Box 2798
Ocala, FL 34478
(352) 671-4600 phone
(352) 671-4646 facsimile
Attorney for Plaintiff Fugate