UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION


ANITA FUGATE,

       Plaintiffs,

v.                             Case No. 5:04-cv-245-Oc-10GRJ

RELIASTAR LIFE INSURANCE COMPANY,
an out-of-state corporation,

       Defendant.
_____/

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT

This case is a claim is for recovery of accidental death benefits provided in connection with an employee benefit plan and, as such, is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 *et seq.* Congress, in adopting ERISA, expected that a federal common law of rights and obligations under ERISA would develop.  *See e.g. Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987);  *Critchlow v. First UNUM Life Ins. Co. of America*, 378 F.3d 246, 255 (2nd Cir. 2004); *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1451 (5th Cir. 1995)*; Kobold v. Aetna US Healthcare, Inc.* 258 F.Supp.2d 1317, 1323-24 (M.D.Fla. 2003).  Importantly, ERISA is not to be interpreted to afford employees less protection than they enjoyed before ERISA was enacted.  *Firestone Tire & Rubber Co. v. Bruch*, 489 US 101, 102 (1989)*; Critchlow*, 378 F.3d at 256 (citing *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936

F.2d 98, 107 (2nd Cir. 1991); and *Brown v. Blue Cross Blue Shield of Alabama, 898 F.2d 1556, 1563 (11th Cir. 1990).*

In deciding a claim for recovery of benefits alleged to be due in connection with an ERISA plan, the Court must determine the standard of review to be applied. There are three potential standards of review applied in the Eleventh Circuit in connection with such claims: (1) <u>*de novo*</u> review, which is the default standard and is applicable when the plan documents do not grant the administrator discretionary authority to interpret the terms of the plan; (2) <u>arbitrary and capricious</u> review, which is applicable when the plan documents grant the plan administrator discretion to interpret the terms of the plan and the administrator has no conflict of interest; and (3) <u>heightened arbitrary and capricious</u> review, applicable when the administrator has been granted discretionary authority to interpret the provisions of the plan, but has a conflict of interest.  *See e.g. HCA Health Services of Georgia, Inc. v. Employer's Health Insurance Co.* 240 F.3d 982 (11th Cir. 2001).

In the instant case, Defendant Reliastar admits that the arbitrary and capricious standard of review is not applicable because it has a conflict of interest. Reliastar is a for-profit insurance company which sold a group life insurance policy to the Mr. Fugate's employer, ADC, to earn premium payments and a profit.  It therefore has a strong conflict of interest when serving as the "claims administrator" evaluating whether to pay Ms. Fugate's claim.  *See e.g. Brown v. Blue Cross and Blue Shield of Alabama*, 898 F.2d 1556, 1562 (11th Cir. 1990).

The Court must therefore determine whether to apply either (a) the *de novo* standard of review or (b) the heightened arbitrary and capricious standard of review.

2

Regardless of which of these two standards of review is applied, the first step in analyzing the claim will be for the Court to first evaluate the claims administrator's decision in order to determine whether the decision is wrong. *See HCA Health Services*, 240 F.3d at 993 [citing *Godfrey v. Bell South Telecommunications, Inc.*, 89 F.3d 755, 758 (11th Cir. 1996)]. This will be addressed first.

After demonstrating Reliastar's decision to deny benefits is wrong, Plaintiff will analyze the claim using the heightened arbitrary and capricious standard of review— the standard Reliastar claims is applicable. Even if the heightened arbitrary and capricious standard of review is applicable, Ms. Fugate is still entitled to summary judgment in her favor. Finally, reasons why the *de novo* standard of review should actually be applied are discussed.

## I.   Reliastar's decision to deny Ms. Fugate's claim for accidental death benefits is wrong.

Reliastar admits Keith Fugate was not attempting to commit suicide at the time of his death, that he did not expect to die, and that at the time of his death he was engaging in the practice of autoerotic asphyxiation. Stipulation at ¶¶ 1-2; and Reliastar's 1/29/02 denial letter (Exhibit H to Ms. Fugate's Statement of Facts). Defendant further admits that autoerotic asphyxiation is "a sexual practice in which the participant seeks increased sexual gratification through the restriction of oxygen flow to the brain." Stipulation at ¶2. Despite these admissions, Defendant has raised two reasons for denial of Ms. Fugate's claim for accidental death benefits: (1) Mr. Fugate's death was allegedly not an accident and therefore does not even qualify as a covered claim to begin with; and (2) Mr. Fugate's death was the result of an intentionally, self-inflicted injury and is therefore excluded from coverage based

3

upon such an exclusion within the policy.  These assertions are wrong and not supported by the evidence made available to Reliastar during its claim evaluation.

### A.   Keith Fugate's death was an accident.

As a preliminary matter, Defendant should be precluded from asserting that Mr. Fugate's death was not the result of an "accident" because it failed to raise this issue in its original letter which gave its reasons for denial.  When the original appeal was prepared,, Ms. Fugate's counsel was not on notice that Reliastar even contested this issue and therefore did not address it.  In addition, Reliastar's failure to raise this defense in its original denial letter suggests it had in fact already concluded, based upon the evidence presented to it, that Mr. Fugate's death was in fact an accident—otherwise it would certainly have raised the issue in denying coverage instead of relying solely upon an exclusion to coverage.  Only at a later time, when Ms. Fugate appealed Reliastar's denial of the claim, did Reliastar reverse its course and raise this defense.  Reliastar should not be permitted to reverse its original determination that Keith Fugate's death was an accident, especially considering Reliastar did not rely upon any new information in reversing its position.  Furthermore, if Mr. Fugate had expected his death then he would be deemed to have been committing suicide, which Reliastar admits is not true.

Reliastar has also made two important admissions in this regard, to wit:  (1) Keith Fugate was not attempting to commit suicide, *see* Stipulation of Facts at ¶2, and (2) Keith Fugate did not intend the final result which occurred (i.e. death).[1] These admissions contradict any suggestion that his death was not an accident.

---

[1]  This second admission is set forth in Reliastar's 1/29/02 denial letter.

Language in ERISA plans, and in insurance policies issued in connection with ERISA plans, should be interpreted as an ordinary plan participant would interpret such language—meaning that the language should be given its ordinary rather than specialized meaning. *See e.g. Todd v. AIG Life Insurance Company*, 47 F.3d 1448, 1455 (5th Cir. 1995); *Parker v. Danaher Corp.*, 851 F.Supp. 1287 (W.D. Ark. 1994); and *Stvartak v. Eastman Kodak, Co.* 945 F.Supp 1532, 1536 (M.D.Fla. 1996) [citing *Dahl-Eimers v. Mutual of Omaha,* 986 F.2d 1379, 1381-82 (11th Cir. 1993) cert. denied, 510 US 964 (1993)]. Webster's Ninth New Collegiate Dictionary 49 (9th ed. 1985) defines the word "accident" as "an unforeseen and unplanned event or circumstance." *Todd*, 47 F.3d at 1455. It is simply illogical to admit that Mr. Fugate did not intent to commit suicide or intend to cause his death, yet argue his death was not an accident. An accident is an occurrence which is <u>unintended</u>. Since Mr. Fugate did not intend his death, as admitted by Reliastar, his death was an accident.

Several federal appellate courts, in ERISA cases governed by federal common law, have indeed addressed whether death occurring in connection with a decedent's participation in autoerotic asphyxiation is considered an "accident" for purposes of a claim for accidental death benefits. For example, in *Todd v. AIG Life Insurance Company*, 47 F.3d 1448 (5th Cir. 1995), the Fifth Circuit addressed this precise issue. In *Todd*, as in the instant case, the decedent died while engaged in autoerotic asphyxiation and, just like in the instant case, the decedent had attempted to restrict oxygen flow to his brain by applying pressure to his neck to constrict blood flow. The Federal District Court which decided the case had ruled, *as a matter of law*, that the decedent's death had been an accident, relying upon federal common

5

law applicable in ERISA claims which indicated that for a death to be deemed an accident under an accidental death policy, it must be determined (1) that the deceased had a subjective expectation of survival and (2) that such expectation was objectively reasonable, which it is if death is not substantially certain to result from the decedent's conduct.  *See Todd*, 47 F.3d at 1456 (citing to *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077 (1st Cir.), *cert. denied*, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990).  After an extensive discussion concerning the meaning of the word accident, the Fifth Circuit determined the above-described standard applied by the lower court was appropriate for determining whether decedent's death qualified as an "accident," upholding the lower court's decision.

The Second Circuit Court of Appeals has also recently addressed whether death occurring in connection with a decedent's participation in autoerotic asphyxiation is considered an accident for purposes of a claim for accidental death benefits.  In *Critchlow v. First UNUM Life Ins. Co. of America*, 378 F.3d 246 (2nd Cir. 2004), the decedent was participating in autoerotic asphyxiation and had been "tied up in various places by cord."  Like the Defendant in the instant case, the Defendant insurer in *Critchlow*, in addition to arguing that decedent's death was due to an intentional, self-inflicted injury, also argued his death was not an accident.  The Second Circuit stated that "because the decedent had a subjective expectation of survival, and that his expectation was objectively reasonable because death was not likely to result, we must conclude that Critchlow's death was accidental [under the standard set forth in *Bennett v. American International Life Assurance Co. of New York*, 956 F.Supp. 201]."  *Critchlow*, 378 F.3d at 264.

6

The *Bennett* case relied upon by the Second Circuit in *Critchlow* was cited by Reliastar's own in-house counsel in the internal legal review it conducted prior to the final denial of Ms. Fugate's claim.  *Bennett* was yet another case in which a federal court addressed whether death occurring in connection with a decedent's participation in autoerotic asphyxiation was an "accident" for purposes of a claim for accidental death benefits governed by ERISA law.  In *Bennett*, the decedent appeared to use both a knot around his neck and a plastic bag in order to restrict oxygen flow to his brain.  *Bennett*, 956 F.Supp. at 202.  The *Bennett* Court chose to adopt the two-part test followed by the Fifth Circuit in *Todd* in determining whether a death qualifies as an accident for purposes of a claim for accidental death benefits under ERISA law.  The court therefore indicated that for such a death to be deemed an accident, it must be determined (1) that the deceased had a subjective expectation of survival, and (2) that such expectation was objectively reasonable, which it is if death is not *substantially likely* to result from the insured's conduct. *Bennett*, 956 F.Supp. at 211.  In addition to *Todd*, *Critchlow*, and *Bennett*, federal courts have determined in other cases, decided under ERISA law, that death occurring in connection with the decedent's participation in autoerotic asphyxiation constitutes an accident for purposes of a claim for accidental death benefits.  *See Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121 (9th Cir. 2002)(discussed in more detail in subsection 2 below); and *Parker v. Danaher Corp. et al.*, 851 F.Supp. 1287 (W.D.Ark. 1994)(death resulting from autoerotic asphyxiation was an "accident" within meaning of ERISA-governed life insurance policy).

Having admitted Mr. Fugate did not commit suicide, and that he did not intend the final result of what occurred—his death—it is simply illogical for Reliastar to suggest his death was not an accident.  The use of artificial and/or hyper-technical definitions of what constitutes an "accident" was rejected by the courts in *Todd*, *Bennett*, *Critchlow*, *Parker*, and *Padfield*.  Common sense tells us that if an occurrence is unintentional, as admitted by Reliastar, it is accidental.

On this issue, the Court should also look to the applicable policy language. Reliastar's policy defines the term accident as "an unexpected, external, violent and sudden event."  Language in insurance policies should be interpreted in accordance with its commonly understood meaning.  *See e.g. Todd v. AIG Life Insurance Company*, 47 F.3d 1448, 1455 (5th Cir. 1995); *Parker v. Danaher Corp.*, 851 F.Supp. 1287 (W.D. Ark. 1994); and *Stvartak v. Eastman Kodak, Co.* 945 F.Supp 1532, 1536 (M.D.Fla. 1996) [citing *Dahl-Eimers v. Mutual of Omaha,* 986 F.2d 1379, 1381-82 (11th Cir. 1993) cert. denied, 510 US 964 (1993)].  Keith Fugate's death was clearly external, violent, and sudden--he was inadvertently strangled to death.

Reliastar, through its 1/29/02 denial letter, has argued Mr. Fugate's death was "not unexpected."  But this conclusion contradicts Reliastar's admissions that Mr. Fugate did not commit suicide and did not intend his death.  If his death was "expected" then he would be deemed to have been committing suicide, and Reliastar admits he was not.  Reliastar's conclusion also contradicts all the scientific evidence made known to Reliastar, through the case law provided either by Ms. Fugate's counsel or its own in-house counsel--before exhaustion of her administrative remedies--that participants in the practice of auto-erotic asphyxiation

8

expect to survive and typically do in fact survive.  The definition set forth in Reliastar's policy does not in any way alter the analysis of the previously cited decisions concerning what constitutes an accident.

> **B.  By engaging in auto-erotic asphyxiation, Mr. Fugate did not intend to "injure" himself.**

The original and exclusive reason Reliastar denied Ms. Fugate's claim was its contention that Keith Fugate intended to injure himself, arguing his death was the result of an "intentional, self-inflicted injury" and therefore excluded from coverage. Reliastar's assertion that Mr. Fugate intended to injure himself is also wrong.

When denying coverage based upon an exclusion within an insurance policy in ERISA cases, it is an insurer's burden to prove the applicability of the exception to coverage.  *See Horton v. Reliance Std. Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998); and *Critchlow v. First Unum Life Insurance Co.* 378 Fd. 3d  246, 256 (2nd Cir. 2004).  Reliastar did not define in its policy what it meant by an "intentionally, self-inflicted injury."  If there are ambiguities in the language of an insurance policy that is part of an ERISA plan, they are to be construed against the insurer.  *HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.* 240 F.3d 982, fn-24 (11th Cir. 2001); *Vickers v. Guardian Life Ins. Co.*, 204 F.Supp.2d 1326, 1332 (M.D.Fla. 2002); *Critchlow*, 378 So.2d at 256; and *Todd*, 47 F.3d at 1451-52.  This is a "hornbook rule of contract interpretation" that applies particularly when the ambiguity is found in an exclusionary clause.  *See Critchlow*, 378 F.3d at 256.  Language in a plan is ambiguous when it is capable of more than one meaning when reviewed objectively by a reasonably intelligent person who has examined the context of the entire

agreement.  *Id.*  As described above, ERISA case law requires this language be given its common, ordinary meaning as would be expected by a plan participant.

Considering these rules of construction, Reliastar cannot demonstrate the applicability of the intentional, self-inflicted injury exclusion.  There is simply no evidence whatsoever in the administrative record that Keith Fugate intended to "injure" himself.  Inferring an intent to injure merely because injury resulted would be an impermissible merging of the concepts of intent and result.  *See e.g. Critchlow*, 378 F.3d at 260.  If such inferences were permitted, i.e. allowing an insurer to infer a decedent intended injury merely because injury resulted, insurers could deny every claim presented for accidental death benefits based upon the  intentional, self-inflicted injury exclusions contained within such policies.

The recent *Padfield* and *Critchlow* decisions, in addition to addressing whether death arising out of decedent's participation in autoerotic asphyxiation qualifies as an accident, also addressed whether the decedent's restriction of oxygen flow to the brain supported a determination that the decedent intended to injure himself.  Both Courts squarely rejected such a contention and ruled, as a matter of law, that such acts do not constitute an intent to injure.   In reaching this conclusion, both courts also noted the well-accepted medical and scientific views that the physiological effects of partial strangulation without loss of consciousness – absent an accident – are a temporary lightheadedness and euphoria with no serious or lasting impact on one's health.  *Critchlow*, 378 F.3d at 260.

In *Padfield*, which was in fact provided to Reliastar before its final denial of Ms. Fugate's claim, nearly identical facts were presented.  The decedent in that case

10

was found naked from the waist down with one end of a necktie around his neck and the other end tied to the sliding door hinge in a van. *Padfield*, 290 F.3d at 1123-24. The coroner found a deep ligature mark around the decedent's neck and listed the cause of death as "hanging." *Id.* Under these facts, the Court held as a matter of law that decedent's death was an accident, and not an "intentionally, self-inflicted injury," directing that summary judgment be entered in favor of the claimant.

Important guidance was provided in *Critchlow* regarding several other issues also existing in this case. First, since the insurer must prove the applicability of the exclusion, an insurer that wishes to defend its denial of benefits by relying on an exclusionary clause has the burden of proving that that clause, strictly applied, is applicable. *Id.* It is thus incumbent on Reliastar to show affirmatively that Mr. Fugate's death was the result of an intentionally self-inflicted injury—the burden is not on Ms. Fugate to show that it was not. *Id.* Reliastar cannot carry its burden in this regard in connection with Mr. Fugate's intent. Its admission that Mr. Fugate was participating in autoerotic asphyxiation negates any contention he intended to injure himself. Reliastar cannot infer an intent to injure simply because injury ultimately occurred. Such reasoning would be circular and would result in denial of all claims for accidental death benefits based upon such an exclusion. While Reliastar may argue that restriction of oxygen flow to the brain constitutes injury, this argument has been squarely rejected in *Padfield* and *Critchlow*—the only cases in which federal appellate courts have addressed the issue.

Just as important, however, are the comments in *Critchlow* regarding consideration of the available scientific evidence by a plan administrator. In

11

*Critchlow* one issue addressed was whether the lower court had erred in excluding affidavits of certain expert witnesses at the trial court level because they had not been presented during the administrative process.  After examining the lower court's decision to exclude such evidence, it stated:

> Although the district court excluded the [expert reports], a significant part of [one of the expert's] views was already, in essence, a part of the administrative record by reason of [the insurer's] invocation of *Bennett v. American International Life Assurance Co. of New York*, 956 F.Supp. 201, 211 (N.D.N.Y. 1997), as a basis for its rejection of plaintiff's administrative appeal.

*See Critchlow*, 378 F.3d at 246.  The *Bennett* case was of course also made known to Reliastar – by its own in-house counsel--before its final denial of Ms. Fugate's claim.  The *Bennett* case, and all the scientific evidence in it, is part of the administrative record in this case.  The same is true for all the scientific evidence presented in *Padfield*, a copy of which was forwarded by counsel for Ms. Fugate to Reliastar prior to its final denial of Ms. Fugate's claim.  Since the *Todd* case is cited, and discussed at length in the *Bennett* opinion, all the scientific evidence presented in *Todd* concerning autoerotic asphyxiation is also a part of the administrative record.  Importantly, ERISA is not to be interpreted to afford employees less protection than they enjoyed before ERISA was enacted.  *See Critchlow*, 378 F.3d at 256 (citing *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 107 (2nd Cir. 1991); and *Brown v. Blue Cross Blue Shield of Alabama,* 898 F.2d 1556, 1563 (11th Cir. 1990).  Reliastar should not be permitted to turn a blind eye to important evidence and information clearly known to it in an effort to unfairly "limit the administrative record" in hopes of denying a compensable claim.  Permitting

such legal maneuvering, particularly considering the procedural deficiencies in Reliastar's handling of this claim, described below, should not be permitted.

In regard to whether the Court can consider the scientific evidence, it is also appropriate to note the *Critchlow* Court's recognition that while "a claimant might be obligated to present to the plan administrators evidence regarding the claimant's condition, [the claimant] would be unfairly burdened by an obligation to present expert testimony to plan administrators on an issue of plan interpretation." *Critchlow*, 378 F.3d at 261[citing *DeFelice v. American International Life Assurance Co.*, 112 F.3d 61, 65 (2nd Cir. 1997). This Court should follow the Second Circuit's lead and ensure ERISA beneficiaries are not unfairly burdened in connection with the administrative process. This is particularly true when the Defendant is a sophisticated, for-profit insurance company as opposed to a potentially unsophisticated, not-for-profit, self-insured ERISA plan.

**II.    Even if the heightened arbitrary and capricious standard of review is applied, as is urged by Defendant, Ms. Fugate is still entitled to summary judgment in her favor.**

When the heightened arbitrary and capricious standard of review is applicable, the review does not stop once the Court has determined that the administrator's decision to deny benefits is wrong. The next step is whether the claimant has proposed a reasonable interpretation of the plan. See *HCA Health Services*, 240 Fd. 3d at 994 [citing *Lee v. Blue Cross/Blue Shield*, 10 Fd. 3d 1547, 1550 (11th Cir. 1994). Since <u>all</u> federal appellate cases decided under ERISA law which address claims for accidental death benefits in connection with deaths arising out of the practice of autoerotic asphyxiation have agreed with the interpretation

which is proposed by Ms. Fugate, *see Padfield*, *Todd*, and *Critchlow*, surely Ms. Fugate has proposed a reasonable interpretation of the plan.

The next step of heightened arbitrary and capricious review is for the Court to determine whether the plan administrator's wrong interpretation is nonetheless reasonable. *HCA Health Services*, 240 Fd. 3d 982 at 994. Defendant's proposed interpretation of the plan is not reasonable. This is especially true considering its admissions that decedent was not attempting to commit suicide, and that he was instead engaging in autoerotic asphyxiation at the time of his death. If Defendant's reasoning and proposed interpretation were permitted to stand, claims for accidental death benefits could be denied whenever death clearly was an accident with no injury intended. For example, if Reliastar's interpretation of its policy was deemed reasonable it would deny a claim in which a snorkler, trying to catch lobster, holds his breath while diving for the lobster – intentionally and temporarily depriving himself or herself of oxygen by submerging themselves under the water –but inadvertently drowns in the process. Such an interpretation is simply unreasonable.

There do appear to be three federal district court cases, decided under ERISA law, in which denial of claims for accidental death benefits in autoerotic asphyxiation cases has been permitted. *See Hamilton v. AIG Life Ins. Co.*, 182 F.Supp.2d 39 (S.D.D.C. 2002); *Cronin v. Zurich American Ins. Co.*, 189 F.Supp.2d 29 (S.D.N.Y. 2002); and *Fawcett v. Metropolitan Life Insurance Co.*, 2000 WL 979994 (S.D. Ohio). None of these cases were decided within the Eleventh Circuit. *Cronin* would appear to no longer be good law in light of *Critchlow* (a later case decided by the Second Circuit Court of Appeals). *Fawcett* is an unpublished district

14

court opinion and should be given little or no weight.  More importantly, however, the courts in each of these cases were not called upon to decide whether an insurer had proposed a underline reasonable interpretation of its insurance policy.  Instead, the courts merely upheld claims administrators' decisions to deny benefits upon the specific facts presented, and the language of the specific policies presented, using the highly deferential arbitrary and capricious standard of review.

If the Court determines Defendant's interpretation is unreasonable, the analysis ends and Ms. Fugate is entitled to summary judgment under the heightened arbitrary and capricious standard of review.

Even if the Court determined the Defendant's proposed wrong interpretation was reasonable, however, the administrator's decision is not necessarily entitled to deference because a strong conflict of interest exists.  *See Brown*, 898 F.2d at 1562. Under the heightened arbitrary and capricious standard of review, the burden then shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest. *Id.* The inherent conflict between its fiduciary role and the profit-making objective of an insurance company makes a highly deferential standard inappropriate.  *See Brown*, 898 F.2d at 1562.  A wrong but apparently reasonable interpretation is considered arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its [decision's] benefit to the plan participants and beneficiaries.  *Id.* at 1567.

The claims administrator therefore must show that its "wrong but reasonable" interpretation benefits the plan participants and beneficiaries.  *See HCA Health*

15

*Services*, 240 Fed.3d at 994-995 [citing *Brown v. Blue Cross Blue Shield of Alabama, Inc.,* 898 Fed.2d at 1568].  If the Court finds that the claims administrator has failed to show that its plan interpretation benefits the plan participants and beneficiaries, the claims administrator's interpretation is not entitled to deference. *HCA Health Services*, 240 Fed. 3d at 995.

Defendant is unable to show that its proposed interpretation benefits the plan participants and beneficiaries.  The Defendant is an insurance company. It is in business to make a profit.  A decision to deny benefits in this case does not benefit plan participants, but instead is a detriment to beneficiaries as it denies accidental death benefits in situations in which death is neither expected nor intended.

During discovery Plaintiff submitted an interrogatory to Defendant requesting that it explain how its decision to deny coverage supposedly benefits plan participants and beneficiaries.  In its response, Reliastar offered the following explanation:

> [It] has a duty to participants and beneficiaries of the Plan to maintain the integrity of it and to pay only those claims that meet the conditions of the Policy and are not excluded by it.  Thus Reliastar has a routine practice by which it reviews claims, and it followed that procedure in this case.  Wrongfully paying claims is contrary to Reliastar's duty to act prudently and in the best interests of all Plan participants… …By strictly adhering to the terms of the Policy, by following its routine of reviewing claims, and by making thoughtful decisions based upon the facts presented, Reliastar acts in the overall best interests of the Plan participants and beneficiaries.

*See* Reliastar's Answer to Interrogatory #12 from Ms. Fugate.

16

This explanation falls well short of demonstrating that Reliastar's decision benefits plan participants and beneficiaries.  If the Court determined this reason was sufficient to satisfy this step of heightened arbitrary and capricious review, the step would be rendered meaningless.  An insurer can <u>always</u> assert this meager response when it denies a claim.  If the Eleventh Circuit had intended to allow such an argument to be sufficient to satisfy this step of heightened arbitrary and capricious review, it would have simply omitted the step altogether.

Defendant's decision to deny benefits merely increases the profits of a for-profit insurance company.  If it is opposed to paying accidental death benefits when an insured dies in connection with the practice of autoerotic asphyxiation, it can simply place such an exclusion within its insurance policy.  The Fifth Circuit, in *Todd*, even expressly noted this fact in 1995.  Keith Fugate's death did not occur until approximately 6 years later, in 2001.  Surely a sophisticated insurer would have changed its policy within 6 years if payment of claims for accidental death benefits in connection with a death arising out of the practice of autoerotic asphyxiation was such a detriment to plan participants.

There is no self-funded employee benefit plan at issue in this case which might become insolvent if the claim is paid.  In answering the interrogatory, Defendant failed to identify any real benefit which would accrue to plan participants if coverage was denied in this case.  In short, Reliastar's arguments in denying coverage fail even with a heightened arbitrary and capricious standard of review.  Plaintiff is still entitled to recover accidental death benefits.

**III.    Defendant has the burden of proving it has been granted discretionary authority to interpret the provisions of the**

**benefit plan in question.  However, it previously admitted that discretionary review was not available.**

In a letter dated April 2, 2003 from Theresa Morones, as "Counsel" for Reliastar, to Ms. Fugate's counsel (Exhibit M to Ms. Fugate's Statement of Facts), Reliastar admits that discretionary authority to interpret the provisions of its insurance policy had not been granted because the plan booklets which had been provided to Mr. Fugate did not inform him of this fact.  Surely Ms. Morones did not communicate such an important issue without having researched and investigated the matter.  While Ms. Fugate's counsel, during discovery, has requested and obtained plan documents from Mr. Fugate's employer, and the documents provided suggest the claims administrator has discretion to interpret the provisions of the employee benefit plan, it is not clear what booklets and notices were, in fact, provided to Mr. Fugate prior to this death.  Unless Reliastar comes forward with proof that appropriate notices were in fact communicated to Mr. Fugate before his death, Reliastar's own admission that it has not been granted discretionary authority should dictate a *de novo* review by the Court.  *See HCA Health Services*, 240 F.3d at 992  (*de novo* review applies unless discretionary authority has been granted).

**IV.    Even if the Court determines Reliastar had been granted discretionary authority to review the terms of the plan, the court should still apply *de novo* review, or give very little deference to Reliastar's decision, due to the serious and prejudicial deficiencies in its handling of Ms. Fugate's claim.**

Reliastar has not conducted a good faith review of this claim.  Throughout the process, it has committed serious and continuing procedural and fiduciary breaches which have adversely affected Ms. Fugate.  They include the following:

18

- Failing to inform counsel for Ms. Fugate, following receipt of his initial 9/17/01 letter, that it contended ERISA applied, or to provide any guidelines concerning the applicable claims procedure described in the denial letter, even though a specific request was made concerning the applicable claims procedures;

- Failing to provide such information in response to the 11/28/01 follow-up letter from counsel for Ms. Fugate;

- Failing to timely respond to the 12/30/02 letter from Ms. Fugate's counsel specifically inquiring whether Reliastar contended ERISA applied to this claim and, if so, whether Reliastar contended it had been granted discretionary authority;

- Failing to timely respond to the 2/6/03 follow-up letter from counsel for Ms. Fugate concerning whether ERISA applied;

- Failing to timely respond to the 3/20/03 follow-up letter from counsel for Ms. Fugate concerning whether ERISA applied;

- Finally denying the claim on 4/2/03, and informing Ms. Fugate she had exhausted her administrative remedies, in the same letter in which Reliastar first communicated its contention that this case was governed by ERISA;

- Advising counsel for Ms. Fugate, through its 4/2/03 letter, that Reliastar did <u>not</u> have discretionary authority to interpret the plan, then contending it has such authority after suit was filed;

- Originally denying the claim based solely upon an exclusion contained within the policy, implicitly suggesting it conceded Mr. Fugate's death was an "accident," only to later reverse its position (without any new evidence) after the original administrative appeal had been submitted by counsel for Ms. Fugate based only upon the reason for denial which had been asserted;

- Searching for reasons to deny the claim in lieu of conducting an objective analysis.

Several Federal Circuits have held that substantial procedural and fiduciary breaches should result in a court applying *de novo* review of claims even if the administrator has been granted discretionary authority.  *See e.g. Morgan v.*

*Contractors, et al.*, 287 F.3d 716, 722-23 (8th Cir. 2002)(*de novo* review applied when the administrators failed to objectively analyze the evidence when considering a claim); *Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1255-56 (2nd Cir. 1996)(deference accorded to a plan administrator "drops away" if the administrator was in fact influenced by a conflict of interest in reaching their decision).  The Ninth Circuit, which uses an approach similar to the approach of the Eleventh Circuit, conducts pure *de novo* review if the administrator cannot prove its conflict of interest did not affect its decision.  *See Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1322-23 (9th Cir. 1995).  The Fourth and Seventh Circuits use a sliding scale which decreases the level of deference given an administrator's decision in proportion to the seriousness of the conflict.  *Id.*; *Doe v. Group Hospitalization & Medical Serv.*, 3 F.3d 80, 87 (4th Cir. 1993); and *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052-53 (7th Cir. 1987).

The Eleventh Circuit itself has noted that when a serious conflict of interest exists, the proper deference to give may be slight, even zero.  *See Brown*, 898 F.2d at 1564.  There is therefore precedent from the Eleventh Circuit which allows the Court to give little or no deference to Reliastar's administrative decision in this case. In the circumstances presented, no deference should be given.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 15, 2005, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which will send a

notice of electronic mailing to the following:  Nancy J. Faggianelli, Esq. and Bradley

J. Betlach, Esq.

THE BRIGGS LAW FIRM, P.A.


By:      __s/Steven W. Wingo_____
         Randy R. Briggs
         Florida Bar No. 197882
         Trial Counsel
         Steven W. Wingo
         Florida Bar No. 0008011
         521 S.E. Fort King Street
         Post Office Box 2798
         Ocala, FL 34478
         (352) 671-4600 phone
         (352) 671-4646 facsimile
         Attorney for Plaintiff Fugate

21