UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ANITA FUGATE,

                Plaintiff,

-vs-                             Case No.  5:04-cv-245-Oc-10GRJ

RELIASTAR LIFE INSURANCE
COMPANY, an out-of-state corporation,

                Defendant.
_____

## O R D E R

      This action arises from the Plaintiff's attempt to recover $206,000 that is allegedly owed to her under an accidental death insurance policy held by her former husband, Keith Fugate, who died as a result of autoerotic asphyxiation.  The case is presently before the Court for consideration of the Parties' cross motions for summary judgment (Doc. 18, 20). The motions are ripe for review, and the Court concludes that the Defendant's motion is due to be granted.

### I. Background

*A. Stipulated Facts*

      The undisputed facts, as set forth in the Parties' "Stipulation of Facts" (Doc. 16), are as follows.  Keith Fugate died on May 19, 2001, in Delray Beach, Florida.  His cause of death was "hanging."[1]  According to the police report, Mr. Fugate was found in his

---

[1]    See Doc. 16, Stipulation of Facts, Exh. G, Medical Examiner's Report.

apartment "fully naked, hanging from the bathroom door of the bathroom . . ."[2]  The police report further states that a "rope . . . had been tied around the back of the door, attached to the door handle and middle hinge."  "The rope came up over the top of the door and hung down the center, attached around the victim's neck." In the bathroom, the police found an opened briefcase containing sexually explicit materials, including adult videos and sexual devices.[3]

The police spoke to Mr. Fugate's ex-sister-in-law, Aurella Honaker, who initially made contact with the police department to check on Mr. Fugate's welfare after she was unable to contact him by phone.[4]  Ms. Honaker advised the police that she never knew Mr. Fugate to be depressed or speak of committing suicide.  She stated that Mr. Fugate's family life was stable, and he had no work-related problems.  In fact, he had just received a promotion.  Mr Fugate's other family members and physician also advised the police that Mr. Fugate had no signs of depression.

Nanette Stubbs, Mr. Fugate's long-distance girlfriend of two years, told the police that Mr. Fugate "was not suffering from depression, he loved life, had full custody of his daughter and he had just received a promotion at work."  Ms. Stubbs advised the police that she and Mr. Fugate had an active sex life together and experimented with bondage. On two occasions the couple watched bondage videos and acted out what was on the

---

[2]     See Doc. 16, Stipulation of Facts, Exh. B, Narrative Police Report.

[3]     Id.

[4]     See Doc. 16, Stipulation of Facts, Exh. C, Police Report.

videos.  Mr. Fugate "wore leashes around his neck, asked to be choked and to have his air cut off."  Ms. Stubbs stated that approximately one month prior to Mr. Fugate's death, he admitted that he fantasized about "being hung, as he heard this intensified a male orgasm."  Ms. Stubbs stated that Mr. Fugate wanted her to assist him with this act by getting him something to stand on and perform a sexual act while removing the object he was standing on.  Mr. Fugate "made it clear that he did not want anything to happen to him."  "He just wanted the thrill and to have an intense orgasm."   Mr. Fugate told Ms. Stubbs that "she was the only person he trusted with his life by acting out this fantasy." Ms. Stubbs stated that they planned to act out the fantasy in June 2001, during their vacation together.

The Parties agree that Mr. Fugate was not attempting to commit suicide at the time of his death, but that he was instead engaging in a sexual practice known as "autoerotic asphyxiation."[5]  Autoerotic asphyxiation "is a sexual practice in which the participant seeks increased sexual gratification through the restriction of oxygen flow to the brain."[6]

*B. The Insurance Policy*

Prior to his death, Mr. Fugate was employed by ADC Telecommunications, Inc. (ADC) as a Special Projects Supervisor.  The Defendant issued Group Life Policy No. GL 6742-3 to ADC.  Under this policy, ADC provided Mr. Fugate basic life insurance in the

---

[5]     See Doc. 16, Stipulation of Facts, pg. 1.

[6]     Id.

amount of $103,000, supplemental life insurance in the amount of $103,000, and accidental death and dismemberment insurance in the amount of $206,000.  The Plaintiff, Mr. Fugate's ex-wife, was the named beneficiary of Mr. Fugate's life and accidental death insurance.

According to the policy, the Defendant pays the benefit under the accidental death and dismemberment insurance "if [the insured] loses [his] life, limb or sight due to an accident."[7]  The policy defines an accident as "an unexpected, external, violent and sudden event."[8]  In addition, the policy states that the Defendant does not pay benefits for loss directly or indirectly caused by "suicide or intentionally self-inflicted injury, while sane or insane."[9]

With respect to plan administration and claims decisions, the Benefits Summary provides:

> ADC is the Plan Administrator and Sponsor of your ADC employee benefit plans.  ADC will have the sole authority, discretion and responsibility to interpret and apply the terms of the plans and to determine all factual and legal questions.  This includes entitlement to benefits and resolution of claims and appeals related to benefits . . .
>
> Benefits under the ADC employee benefit plans will be paid only if the Plan Administrator or the person/third party to whom ADC has delegated authority decides in its discretion that the claimant is entitled to them.  The Plan Administrator may adopt from time to time such rules as it deems necessary,

---

[7]    Doc. 19, Defendant's Memorandum in Support of Summary Judgment, Part 11, Policy Number GL-6742-3, pg. 20.

[8]    Id. at 25.

[9]    Id. at 20.

4

desirable or appropriate.   All determinations, interpretations, rules and decisions of the Plan Administrator shall be made in its sole discretion and shall be conclusive and binding upon all persons having or claiming to have any interest or right under a plan.[10]

The Benefits Summary also states that ADC retained the Defendant "to administer and pay all eligible life insurance and accidental death and dismemberment claims incurred under the terms of the Plan."[11]  The Benefits Summary provides that the Defendant "will have the sole authority, discretion and responsibility to interpret and apply the terms of the plan and to determine all factual and legal questions, including entitlement to benefits and the amount of benefits paid, if any."[12]

*C. Denial of the Plaintiff's Claim*

On June 11, 2001, Ms. Fugate made a claim for benefits available under Mr. Fugate's policy, and the Defendant paid Ms. Fugate's claim for basic life benefits in the amount of $103,000 and for the supplemental life benefits in the amount of $103,000.[13] The Defendant, however, denied Ms. Fugate's claim for accidental death benefits.

The claim file in connection with the Plaintiff's claim for accidental death benefits, includes, in relevant part, the Plaintiff's death claim form, Mr. Fugate's death certificate, the medical examiner's report, Mr. Fugate's life insurance enrollment form, the police

---

[10]     Doc. 19, Defendant's Memorandum in Support of Summary Judgment, Part 9, Administrative Information, pg. 2.

[11]     Id. at 3.

[12]     Id. at 5.

[13]     Doc. 16, Stipulation of Facts, pg. 2-3.

5

reports related to Mr. Fugate's death, written communication between the Plaintiff and the Defendant, and a legal memorandum with respect to the Plaintiff's claim authored by the Defendant's in-house counsel.[14]

Diane Yell and Sharon Dudero, employees of the Defendant for well over a decade each, processed the Plaintiff's claim for benefits.[15]  Ms. Yell testified that the Defendant followed routine procedures and policies, as set forth in the Defendant's claims manual, when processing the Plaintiff's claim for benefits.[16]  Ms. Yell also stated that the Defendant "investigated the facts and circumstances surrounding Mr. Fugate's death and obtained police and medical examiner's records regarding his death."[17]  She explained that this information "revealed that Mr. Fugate died as a result of a self-

---

[14]      See Doc. 19, Defendant's Memorandum in Support of Summary Judgment, Part 12, Affidavit of Diane Yell, pg. 2, and Parts 13-16, Claim File.  The written communications consist of: (1) two letters from the Defendant to the Plaintiff denying her claims (dated August 1, 2001 and January 29, 2002); (2) a letter from the Plaintiff's counsel to the Defendant dated September 17, 2001, requesting review of the Plaintiff's claim and information about the Plaintiff's initial claim and policy; (3) a letter from the Defendant to the Plaintiff dated September 25, 2001, acknowledging receipt of the Plaintiff's letter and providing the Plaintiff with policy information; (4) a letter from the Plaintiff's counsel to the Defendant dated November 28, 2001, requesting claim guidelines, asking what additional documentation the Defendant needs to review the claim, asking whether the Plaintiff's appeal is timely, and providing additional information and arguments as to why the Plaintiff's claim should not be denied.

[15]      See Doc. 19, Defendant's Memorandum in Support of Summary Judgment, Part 12, Affidavit of Diane Yell, pg. 2.

[16]      Id. at 3.

[17]      Id.

6

inflicted injury, which is excluded under the explicit terms of the Plan."[18]  Further, Ms.

Yell stated that the "[u]ndisputed documentation by the police, the medical examiner

and other reliable officials indicate that Mr. Fugate purposefully and intentionally

secured a noose around his neck and hung himself from the bathroom door, resulting in

his death."[19]  "Although Mr. Fugate may have not intended to kill himself, he did intend

to obstruct the oxygen supply to his brain, and it was this very act of constricting his

oxygen supply that caused his death."[20]  Ms. Yell testified that after considering all

terms, conditions, and limitations of the Mr. Fugate's insurance policy, the Defendant

determined that Mr. Fugate's death was the result of self-inflicted injury and therefore

the accidental death benefits were not payable.[21]

After the Plaintiff was denied benefits under the policy, she obtained counsel and

appealed the decision of the Defendant.  The Plaintiff's counsel provided the Defendant

with a copy of Mr. Fugate's autopsy report and argued that there was no evidence of

pre-death injury and no evidence that Mr. Fugate intended to cause his death.[22]  Ms.

---

[18]    Id.

[19]    Id.

[20]    Id.

[21]    Id.  See also Doc. 19, Defendant's Memorandum in Support of Summary Judgment, Part 14, pg. 4; Doc. 20, Plaintiff's Motion for Summary Judgment, Part 5, pg. 1, Letter dated August 1, 2001, from the Defendant to the Plaintiff denying accidental death benefits for a loss caused by an intentionally self-inflicted injury.

[22]    See Doc. 20, Plaintiff's Motion for Summary Judgment, Part 8, pg. 3, Letter dated (continued...)

7

Yell testified that in reconsidering the Plaintiff's claim for accidental death benefits, the Defendant considered the arguments put forth by the Plaintiff counsel and also considered the legal opinion of one of the Defendant's in-house lawyers.[23]   Counsel for the Defendant agreed that the circumstance of Mr. Fugate's death fell within the policy's self-inflicted injury exclusion and thus the claim was properly denied.[24]   Additionally, the Defendant's in-house counsel advised that the claim should also be denied since Mr. Fugate's death was not an "accident" because it was not "unexpected" as defined by the policy.[25]   On January 29, 2002, the Defendant denied the Plaintiff's claim for accidental benefits for a second time, and concluded that the claim was not payable "because the death did not meet the definition of accident under the policy and because the death was an excluded loss under the accidental death benefit provisions of the policy," specifically, the intentional self-inflicted injury exclusion.[26]

Nearly one year after the Defendant denied the Plaintiff's claim for benefits for the second time, the Plaintiff's counsel sent the Defendant the recent decision of  Padfield

---

[22](...continued)
November 28, 2001, from the Plaintiff to the Defendant.

[23]     See Doc. 19, Defendant's Memorandum in Support of Summary Judgment, Part 12, Affidavit of Diane Yell, pg. 4; Doc. 20, Plaintiff's Motion for Summary Judgment, Part 15, Diane Yell's request to in-house counsel to review Ms. Fugate's claim and in-house counsel's response.

[24]     Id.

[25]     Id.

[26]     Doc. 20, Plaintiff's Motion for Summary Judgment, Part 9, Second letter from the Defendant to the Plaintiff denying her claim.

v. AIG Life Insurance Company, 290 F.3d 1121 (9th Cir. 2002), a case involving an autoerotic asphyxiation claim, and suggested that the Parties participate in "pre-suit mediation."[27]  On April 2, 2003, the Defendant declined "to engage in pre-suit mediation and maintain[ed] the denial of [the Plaintiff's] claim for benefits."[28]

## II. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In Celotex Corp. v. Catrett, the Supreme Court recognized that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[29]  The moving party bears the initial burden of establishing the nonexistence of a triable fact issue.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come

---

[27]     Doc. 20, Plaintiff's Motion for Summary Judgment, Part 10, Letter dated December 30, 2002.

[28]     Doc. 20, Plaintiff's Motion for Summary Judgment, Part 14, Letter dated April 2, 2003.

[29]     477 U.S. 317, 322 (1986).

9

forward with "sufficient evidence of every element that he or she must prove."[30]  The

non-moving party may not simply rest on the pleadings, but must use affidavits,

depositions, answers to interrogatories, or other admissible evidence to demonstrate

that a material fact issue remains to be tried.[31]

### III. ERISA Standard of Review

The Parties agree that the insurance policy at issue is an employee welfare

benefit plan governed by the Employee Retirement Income Security Act of 1964, 29

U.S.C. § 1001 *et. seq.* (ERISA).[32]  Section 1132(a)(1)(B) of ERISA provides that a plan

participant or beneficiary may bring a civil action in district court "to recover benefits due

to him under the terms of his plan."  ERISA, however, does not specify the standard to

be applied when reviewing a claims administrator's decision to deny benefits. To fill this

gap, the Supreme Court held in Firestone Tire & Rubber Co. v. Bruch:

> a denial of benefits challenged under § 1132(a)(1)(B) is to be
> reviewed under a *de novo* standard unless the benefit plan gives
> the administrator or fiduciary discretionary authority to determine
> eligibility for benefits or to construe the terms of the plan.[33]

If the plan documents explicitly grant the claims administrator discretion to determine

eligibility for benefits or to construe the terms of the plan, then the claims administrator's

---

[30]     Rollins v. Techsouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).

[31]     Celotex, 477 U.S. at 324.

[32]     See Doc. 17, Notice to Defendant and the Court Concerning Plaintiff's Abandonment of Count I of this Action.

[33]     489 U.S. 101, 115 (1989).

decision to deny benefits is reviewed for abuse of discretion.[34]   That is to say that the decision will not be disturbed unless it was arbitrary and capricious.[35]   A decision is arbitrary and capricious if it is unreasonable in light of the evidence before the claims administrator at the time the decision was made.[36]  This deferential standard is modified, however, in situations where the claims administrator is operating under a conflict of interest.[37]   If a conflict of interest exists, then the deference afforded by arbitrary and capricious review is diminished, and the Court reviews the decision under the "heightened" arbitrary and capricious standard.[38]  Once the Court determines the appropriate standard,

---

[34]    HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 992 (11th Cir. 2001).

[35]    Jett v. Blue Cross & Blue Shield, 890 F.2d 1137, 1139 (11th Cir. 1989) (stating that abuse of discretion and arbitrary and capricious standards are interchangeable).

[36]    Id. ("When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard . . . the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.").

[37]    HCA Heath Servs., 240 F.3d at 993; Brown v. Blue Cross & Blue Shield, 898 F.2d 1556, 1563 (11th Cir. 1990) ("[T]he application of the standard is shaped by the circumstances of the inherent conflict of interest."). See also Firestone Tire & Rubber, 489 U.S. at 115 ("Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." (internal quotations omitted)).

[38]    HCA Heath Servs., 240 F.3d at 993. In other words, the Eleventh Circuit "has adopted the following standards for reviewing administrators' plan interpretations: (1) de novo where the plan does not grant the administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." Buckley v. Metropolitan Life, 115 F.3d 936, 939 (11th Cir. 1997).

it must apply that standard to the claims administrator's factual determinations and plan interpretation with equal force.[39]

The first step in determining which standard to apply is to look to the plan documents to see if the claims administrator is granted discretion to determine eligibility for benefits or to construe the terms of the plan.  The Court finds that the plan documents in this case confer such discretion on the Defendant as the plan's claims administrator.[40]  Therefore,

---

[39]     Torres v. Pittston Co., 346 F.3d 1324,1329 (11th Cir. 2003).

[40]     See Doc. 19, Defendant's Memorandum in Support of Summary Judgment, Part 9, Benefits Summary.  The Plaintiff's response to the Defendant's motion for summary judgment does not challenge whether the Defendant had discretion under the policy and only addresses the heightened and general arbitrary and capricious standards of review.  See Doc. 26, Plaintiff's Response, pg. 9-20.  In the Plaintiff's motion for summary judgment, the Plaintiff argues that the Defendant has not proven it had discretion in administering the plan in this case.  See Doc. 21, Plaintiff's Memorandum in Support of Summary Judgment, pg. 18.  To support her argument, the Plaintiff relies on a letter she received from one of the Defendant's in-house lawyers prior to the commencement of this litigation which stated that "this policy is subject to ERISA; however, the booklet that the employer provided the insured does not contain discretionary authority language outlining a right for the claim administrator to interpret the plan provisions."  The Plaintiff concedes that the Defendant received documents from Mr. Fugate's employer which suggest that the claim administrator had discretion, but the Plaintiff nevertheless argues that the Defendant has not proven that this policy information was provided to Mr. Fugate prior to his death and therefore has not proven the Defendant had discretion under the policy.  In response, the Defendant admits that its in-house counsel was mistaken that the Defendant did not have discretion, and submitted to the Court a copy of ADC's 2001-2002 Benefits Summary, which the Defendant received through discovery from the Plaintiff, and which clearly provides the Defendant with discretion.  See Doc. 19, Defendant's Memorandum in Support of Summary Judgment, Part 2, Affidavit of Bradley J. Betlach, and Part 9, Benefits Summary.  The Court finds that this Benefits Summary, along with the fact that the Plaintiff virtually conceded in her response to the Defendant's motion for summary judgment that the Defendant had discretion under the plan, demonstrates that there is no genuine factual issue as to whether the Defendant had discretion in administering ADC's life insurance plan.

depending on the existence of a conflict of interest, either the arbitrary and capricious standard or possibly the heightened arbitrary and capricious standard will apply.[41]

Regardless of which standard applies, the Court first "evaluates the claims administrator's interpretation of the plan to determine whether it is 'wrong.'"[42] "Wrong" is the label used to describe "the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation."[43] If the Court determines that the claims administrator's decision was not wrong, then summary judgment must be entered in favor of the Defendant. If, on the other hand, the Court concludes that the decision was wrong, it will then decide whether the administrator's decision was nevertheless reasonable in light of the facts known to the administrator at the time the decision was made.[44]

It is at this point that the Court must consider the self-interest of the claims administrator.[45] If no conflict of interest exists, then the arbitrary and capricious standard

---

[41]    HCA Heath Servs., 240 F.3d at 993.

[42]    Id.; Brown, 898 F.2d at 1566 n.12; Lee v. Blue Cross/Blue Shield, 10 F.3d 1547, 1550 (11th Cir. 1994).

[43]    HCA Heath Servs., 240 F.3d at 994 n. 23.

[44]    Id. at 994 ("We cannot over emphasize the importance of the discretion afforded a claims administrator; the underlying premise of arbitrary and capricious, rather than *de novo*, review is that a court defers to the discretion afforded the claims administrator under the terms of the plan.").

[45]    Id. The Eleventh Circuit has recognized that "a strong conflict of interest exists when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims." Brown, 898 F.2d at 1562 (internal quotations omitted).

requires that the claims administrator's wrong but reasonable decision must stand.  If, however, a conflict of interest exists, the Court applies the heightened arbitrary and capricious standard, and the burden shifts to the claims administrator to prove that its decision was not tainted by self-interest.[46]   "[A] wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries."[47] Accordingly, if the Court determines that the claims administrator has failed to meet its burden of establishing that its decision benefits the class of participants and beneficiaries, then the decision is not entitled to deference.[48]  Even if the claims administrator carries its burden in this respect, the Plaintiff may still succeed if she can show that the decision is "arbitrary and capricious by other measures."[49]

## IV. Discussion

*A. Reasonableness of the Defendant's Decision*

For purposes of analysis the Court will assume, without concluding, that the Defendant's decision to deny the Plaintiff's claim for accidental death benefits, including its subsequent decision to uphold the denial of the claim, was "wrong" under a *de novo*

---

[46]  HCA Heath Servs., 240 F.3d at 994-95.

[47]  Brown, 898 F.2d at 1566-67.

[48]  HCA Heath Servs., 240 F.3d at 995.

[49]  Brown, 898 F.2d at 1568; HCA Heath Servs., 240 F.3d at 995.

standard of review.[50]   The next step in the analysis under either the arbitrary and capricious

or heightened arbitrary and capricious standard is to determine whether the Defendant's

decision has some reasonable basis in the facts known to the Defendant at the time the

decision was made so that the decision was not arbitrary and capricious.[51]   Upon a

thorough review of the administrative record and after due consideration of the Plaintiff's

arguments, the Court concludes that the decision to deny the Plaintiff's accidental death

claim is well supported by a reasonable basis in the facts known to the Defendant at the

time the decision was made.  That there is also some support for the Plaintiff's position

does not render the Defendant's decision devoid of any basis in fact.[52]

      The Defendant denied the Plaintiff's claim for accidental death benefits because Mr.

Fugate's death was not an "accident" as defined by the policy and because his death was

caused by an intentional self-inflicted injury, which is expressly excluded under the terms

of the policy.  The Court concludes that the Defendant's decision to deny benefits based

on the intentional self-inflicted injury exclusion was reasonable.  The Defendant concluded

that Mr. Fugate's death was caused by an intentional self-inflicted injury based on the

---

[50]      See Thomas v. Lockheed Martin Info. Sys., 155 F. Supp. 2d 1316, 1324 n. 8 (N.D. Fla. 2001) (noting the distinction between cases turning on legal interpretations *vis-a-vis* factual interpretations with respect to the application of Brown's *de novo* "wrong" analysis). See also, Boin v. Verizon South, Inc., 283 F. Supp. 2d 1254, 1265 n.8 (M.D. Ala. 2003) (noting the overlap between the "wrong" analysis and the application of the arbitrary and capricious standard).

[51]      Jett, 890 F.2d at 1139.

[52]      Id. at 1140 ("As long as a reasonable basis appears for [the claims administrator's] decision, it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision.").

police and medical examiner's reports, which showed that Mr. Fugate intentionally tied a

noose around his neck to constrict the oxygen flow to his brain so that he might achieve

a more intense orgasm.  As demonstrated by the cases relied upon by both parties, courts

and experts disagree over whether such a constriction of oxygen to the brain due to the

practice of autoerotic asphyxiation is an intentional self-inflicted injury or not.[53]  The fact

---

[53]      In Fawcett v. Metro. Life Ins. Co., 2000 WL 979994, at *3, 5 (S.D. Oh. June 28, 2000), the district court in an ERISA case held that the insurance company's application of the self-inflicted injury exclusion in an autoerotic asphyxiation claim was not arbitrary and capricious. Additionally, in Hamilton v. AIG Life Ins. Co., 182 F.Supp.2d 39, 46-50 (D.D.C. 2002), the district court in an ERISA case held that the insurance company did not abuse its discretion in concluding that partial strangulation resulting from the practice of autoerotic asphyxiation was an intentional self-inflicted injury.  There are also federal district court cases decided on state law grounds which conclude that a death from autoerotic asphyxiation is an intentional self-inflicted injury.  See Sigler v. Mutual Ben. Life Ins. Co., 506 F.Supp. 542, 545 (D.C. Iowa 1981); Sims v. Monumental General Ins. Co., 960 F.2d 478, 480 (5th Cir. 1992).
        On the other hand, in Critchlow v. First UNUM Life Ins. Co. of America, 378 F.3d 246, 263 (2d Cir. 2004), the Second Circuit held in an ERISA case under de novo review that the "intentionally self-inflicted injury" policy exclusion does not unambiguously apply to death from autoerotic asphyxiation.  The court further explained that "the physiological effects of partial strangulation without loss of consciousness – absent an accident – are a temporary lightheadedness and euphoria with no serious or lasting adverse impact on one's health . . . and that autoerotic asphyxiation is not likely to result in death" Id. at 260.  See also Padfield v. AIG Life Is. Co., 290 F.3d 1121, 1124-25, 29 (9th Cir. 2002) (holding in an ERISA case on de novo review that a loss resulting from the practice of autoerotic asphyxiation is not an intentional self-inflicted injury, and therefore recovery under the policy is not precluded); Travis v. Veterans Life Ins. Co., 60 Fed. Appx. 70, 709 (9th Cir. 2003) (holding under state law that the insured's death, which occurred while practicing autoerotic asphyxiation, did not fall within the accidental death policy's exclusion for "intentionally self-inflicted injury"); American Bankers Ins. Co. of Florida v. Gilberts, 181 F.3d 931, 933-34 (8th Cir. 1999) (holding under state law that fact question existed as to whether the insured's intended act (engaging in autoerotic asphyxiation) constituted bodily injury, and also noting that the experts disagree on whether a temporary decrease in oxygen levels to the brain is an injury).

that reasonable minds disagree on this issue confirms that the Defendant's decision was reasonable.[54]

However, the Court's analysis cannot end here; at this point the Court must gauge the self-interest of the Defendant and, if a conflict of interest exists, consider whether the reasonable decision advances the Defendant's own interest at the expense of the affected plan beneficiaries or participants.[55]

*B. The Defendant's Self-Interest*

The Eleventh Circuit has concluded that a "strong conflict of interest exists when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims."[56]  Since this is the case here, the heightened arbitrary and capricious standard applies.

The application of this standard "is shaped by the circumstances of the inherent conflict of interest" and "must be contextually tailored."[57]  "The degree of deference exercised in review of a fiduciary's decision ranges from slight to great, depending upon

---

[54]    See Fawcett, 2000 WL 979994, at *7.   Since the Court finds the Defendant's decision to deny benefits based on the intentional self-inflicted injury exclusion was reasonable, it is unnecessary to address the reasonableness of the Defendant's decision to deny the Plaintiff's claim because Mr. Fugate's death was not an "accident," as defined by the policy.

[55]    HCA Heath Servs., 240 F.3d at 994-95.

[56]    Brown, 898 F.2d at 1562 (internal quotations omitted).

[57]    Id. at 1563-64.

17

the dynamics of the decision making process."[58]  "[W]hen a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest."[59]   A claims administrator may satisfy this burden by justifying its decision "on the ground of its benefit to the class of all participants and beneficiaries."[60]  "Even a conflicted fiduciary should receive deference when it demonstrates that it is exercising discretion among choices which reasonably may be considered to be in the interest of the participants and beneficiaries."[61]

In a heavily fact-laden inquiry, as opposed to a pure question of plan interpretation, the adverse effect of a claims administrator's decision on the class of beneficiaries and participants is circumscribed by the facts of the claim before the administrator.  In contrast, when a claims administrator bases its decision on plan interpretation, its decision establishes what the plan means for all beneficiaries or participants, regardless of the particular facts of their case.  Thus, a "contextually tailored" modification of the arbitrary

---

[58]    Id. at 1564.

[59]    Id. at 1566.

[60]    Id. at 1567.

[61]    Id. at 1568.

and capricious standard should reflect the narrow impact of the claims administrator's fact-based denial of a single claim *vis-a-vis* its plan interpretation.[62]

In light of the foregoing and in accordance with the teachings of <u>Brown v. Blue Cross and Blue Shield</u>,[63] the Court will adjust the burden-shifting analysis to reflect the dynamics of a decision making process involving a question of plan interpretation, in particular, whether the intentional self-inflicted injury exclusion applies to autoerotic asphyxiation claims.

The Plaintiff argues that the Defendant demonstrated that it was acting in its own self-interest by changing its reasoning for denying the Plaintiff's claim over time; not including the Plaintiff's counsel's most recent letters in the claim file; ignoring pertinent case law; relying on cases during litigation which it did not consider during its claim review process; failing to interview outside experts, counsel, and family members directly; failing to respond to counsel's requests for information in a timely manner; and ignoring evidence in the police reports.  These arguments are without merit. The Defendant's addition of another reason as to why the Plaintiff's claim should be denied after reviewing her claim for a second time and after consulting with its in-house lawyer simply demonstrates that the Defendant in fact reviewed the Plaintiff's claim on appeal and considered additional

---

[62]     This is not to say that with respect to fact-based decisions the claims administrator's self-interest is irrelevant to whether the decision was arbitrary and capricious. <u>Torres v. Pittston Co.</u>, 346 F.3d 1324,1329 (11th Cir. 2003) (heightened arbitrary and capricious standard applies with equal force to factual determinations and plan interpretation).

[63]     898 F.2d 1556 (11th Cir. 1990).

arguments.   With respect to the Plaintiff's letters missing from the claim file and the Defendant ignoring information in the police reports – the record suggests that the Defendant considered all of the Plaintiff's arguments that she made on appeal through counsel and also reviewed the police reports, but simply disagreed with the Plaintiff's position.[64]   With respect to the Defendant ignoring case law, it should be noted that the decisions primarily relied upon by the Plaintiff (<u>Critchlow</u> and <u>Padfield</u>) were not decided when the Defendant reviewed the Plaintiff's claim for the first and second time. Furthermore, as noted previously, there are conflicting decisions as to whether this type of claim is recoverable under a policy with an intentional self-inflicted injury exclusion, and, unlike this case, both <u>Critchlow</u> and <u>Padfield</u> were decided on *de novo* review.  Finally, the Court finds that the Defendant's failure to interview family members or experts does not demonstrate that the Defendant's decision was tainted by self-interest – the facts in this case are undisputed and there is no evidence that these type of interviews would have had any impact on the success of the Plaintiff's claim.

On the other hand, the Court recognizes several factors militating against a finding that the Defendant acted to advance its own interest rather than base its decision on the policy as applied to the Plaintiff's claim. The amount reserved by the Defendant for the Plaintiff's claim ($206,000) is slight when compared to the size of the Defendant's financial

---

[64]     <u>See</u> Doc. 20, Plaintiff's Motion for Summary Judgment, Part 11, Defendant acknowledges receipt of Plaintiff's December 30, 2002 letter and the <u>Padfield</u> decision, and Part 14, April 2, 2003 letter from the Defendant's in-house lawyer also acknowledging the Defendant's December 30, 2002 letter and maintaining denial of the Plaintiff's claim.

position.[65]   Further, the Court agrees that plan participants and beneficiaries benefit by

lower premiums when the Defendant exercises its contractual right to deny accidental

death benefits in cases where the insured is excluded under the policy.   Finally, and

importantly, the Defendant's decision is well supported in the administrative record.   In

particular, the record suggests that competent claims administrators followed routine

procedures in processing the Plaintiff's claim, and considered pertinent evidence, including

the police and medical examiner's reports relating to Mr. Fugate's death, as well as

Plaintiff's counsel's arguments on appeal and its own in-house counsel's advice in deciding

to deny the Plaintiff's accidental death benefits.[66]   Accordingly, the Court is satisfied that

the Defendant's decision to deny accidental death benefits was not motivated by the

Defendant's own interest, but rather represents a rational decision based on the merits of

the Plaintiff's case.[67]

---

[65]     The Plaintiff suggests that the Defendant's financial interest is significant in that it will reap the benefits of denying all autoerotic asphyxiation claims.  Elsewhere in the Plaintiff's argument, however, she admits that the scientific evidence suggests that deaths resulting from autoerotic asphyxiation are rare.   See, e.g., Doc. 21, Plaintiff's Memorandum in Support of Summary Judgment, pg. 8-9 ("participants in the practice of auto-erotic asphyxiation expect to survive and typically do survive.")

[66]     See Williams v. BellSouth, 373 F.3d 1132, 1138 (11th Cir. 2004) ("But, if the administrator can demonstrate a routine practice or give other plausible justifications – such as benefitting the interests of other beneficiaries – judicial deference to it may be granted."); Fick v. Metro. Life Ins. Co., 347 F.Supp.2d 1271, 1286 (S.D. Fla. 2004) (stating that "the competency of the claims administrator may be relevant").

[67]     The Plaintiff has not presented evidence to support the conclusion that the Defendant's decision was arbitrary and capricious "by other measures."

## V. Conclusion

Accordingly, upon due consideration, it is adjudged that:

(1) the Defendant's motion for summary judgment (Doc. 18) is GRANTED;

(2) the Plaintiff's motion for summary judgment (Doc. 20) is DENIED; and

(3) the Clerk is directed to enter judgment in favor of the Defendant, terminate all pending motions and close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 23rd day of May, 2005.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Maurya McSheehy, Courtroom Deputy